| .THOMAS F. DALEY, Judge.
Plaintiff Herndon & Associates, a former insurance broker for Travelers Insurance Company, appeals a judgment that granted it damages in the amount of *781 $685.00 against Autin-Gettys-Cohen Insurance Agency (Gettys) and that dismissed its suit against Travelers. On appeal, Herndon argues that the trial court erred in dismissing Travelers. They argue that Travelers was arbitrary and capricious in its refusal to honor Herndon’s clients’ requests to change agent of record from Gettys to the Bush-LeNormand agency, and that Travelers’ actions constituted tortious interference with Herndon’s contractual relationship with their clients. They also argue that the damage award was inadequate against Gettys. After thorough review of the record and the law, we amend the judgment to increase the amount of damages owed to Herndon, and as amended, affirm the judgment.
In the late 1980s, plaintiff Herndon & Associates was an insurance broker authorized by Travelers Insurance Company to write Travelers automobile policies, 13other personal lines, and commercial lines. In late 1989, Travelers notified Herndon that it was cancelling its agency contract with Herndon regarding automobile policies and possibly remaining lines as well. Travelers account analyst Barbara Sims testified that this decision was based upon a business plan Travelers instituted in Louisiana in the late 1980s to reduce Travelers’ losses statewide, and that this plan affected all Travelers agencies, not just Herndon. Herndon looked for another Travelers agency with which to place its automobile business and entered into an a verbal brokerage agreement with Lawrence Gettys of defendant Gettys Insurance agency. In their verbal agreement, Gettys agreed to accept Herndon’s Travelers automobile policies and further agreed to share commissions on these policies with Herndon in a 50/50 split. Both Get-tys and Herndon testified that the parties discussed a merger between the two agencies, though no merger was ever reached. Both parties testified that the brokerage agreement was verbal and that no specific duration of the agreement was discussed.
At the direction of Travelers, the Hern-don auto policies were transferred to Get-tys by the insureds filling out new applications with Travelers through the Gettys agency. Mr. Jim Herndon testified that this method of transfer was unusual; usually, a policy could be transferred by the insured signing an “agent of record” letter requesting that his policy be listed with the new agent. Herndon also testified that a “bordereau” transfer could have been used, in which Travelers simply changed the agent code on those policies in the computer. Sims and Paul Ratliff, another supervisor with Travelers, both testified that the business plan in place for Louisiana at this time required all insureds desiring an agent transfer to fill out new applications through the new or receiving agency. The reason for this was so the new agency could “reunderwrite” the policy, which was to conduct a current review of the risk |4and get updated policy information, a practice that would help the new local agent and Travelers evaluate the risks involved in the policy and help reduce Travelers’ loss ratios in automobile policies in Louisiana.
There was testimony from Lawrence Gettys and Travelers that the transfer of the Herndon policies to Gettys was problematic because Herndon did not follow Travelers’ procedures, and submitted incomplete applications and/or applications signed by Herndon and not the Gettys agency. Sims and Ratliff testified that they notified Herndon of the correct procedures to transfer the policies as per the business plan for Louisiana, i.e. the new applications, several times by phone conversation, but that this procedure was not written in a manual. They said it was not Travelers’ custom to memorialize the business plan in written form because these *782 procedures changed from time to time. They were clear, however, that the requirement of new applications for transfers was communicated to Herndon and was a procedure statewide at that time. In any event, the testimony established that the policies were eventually transferred from Herndon to Gettys via new applications through the Gettys agency.
In July of 1991, Gettys notified Herndon in writing that it no longer wanted Hern-don’s automobile book, and that Herndon had until the end of the year to find another agency. In September of that year, Gettys also notified Herndon that henceforth it would retain 70%, rather than 50%, of the commissions from former Herndon policies. Lawrence Gettys testified that there were several reasons for this decision. First, he said that the automobile policies showed poor loss ratios and he no longer wanted them. He found that many insureds had lied on the policies, denying tickets and accidents that had in fact occurred. It became too expensive to retain these policies because they had high loss ratios. Both Herndon and Gettys had | .^testified that they discussed a merger of the two agencies, but that it didn’t come to fruition. Gettys testified that it was never his intention to accept only the auto business, as auto policies were high risk and were unattractive to any agent without also receiving the homeowners and commercial lines, which tend have much lower loss ratios. When it became clear that Gettys would not be receiving the other lines, he decided that it was no longer worth servicing Herndon’s automobile policies and notified Herndon in writing in July of 1991 that Herndon had until December 31, 1991, to take the auto policies to another agency, and that any policies not transferred from Gettys at that point would be considered Gettys’ property. Gettys notified Herndon in September of 1991 that from that point until the end of the year, it would pay Herndon 30% of the commissions from its auto book instead of the previous rate of 50%. Gettys testified that he had retained $685.00 in commissions due to Herndon from the end of 1991 because a Mike Sims, who was a subpro-ducer with Herndon, notified him that he was not getting his commissions from Herndon on certain policies that Sims had produced for Herndon. Gettys told Sims that he had to work this out with Herndon, because Gettys had never heard of Sims and didn’t know what, if anything, was due to Sims. Gettys retained the $685.00 in commissions because Sims had made a claim on these funds and he didn’t know whom he should pay.
At this point, Herndon testified that it had located the Bush-LeNormand agency, an authorized agent with Travelers, to take its auto book. Herndon testified that Travelers advised them that they could do the transfers by agent of record letters or new applications, whichever it preferred, and that it attempted to make the transfer via agent of record letters. However, Travelers returned the agent of record letters to Bush LeNormand, saying that the letters were not in the proper form. When Herndon resubmitted the letters, Mr. Herndon testified that he was notified that Travelers ^required new applications and that agent of record letters were not acceptable. There was testimony that eventually most of Herndon’s auto business was transferred from Gettys to Bush-LeNormand.
Herndon sued Gettys, alleging that Get-tys arbitrarily reduced their commissions in breach of their agreement, and prayed for a judgment recognizing Herndon’s right to 50% of the commissions as long as the business remained at Gettys, in perpetuity.
*783 Herndon also sued Travelers, alleging that Travelers refused to allow the transfer of the former Herndon policies from Gettys to Bush LeNormand and thereby cost Herndon to lose the commissions on those accounts.
Trial was held on November 29 and 30, 1999. Judgment was rendered on June 7, 2000, awarding Herndon $685.00 from Get-tys in unpaid commissions from September to December of 1991, that Mr. Gettys admitted in testimony he owed Herndon.
On appeal, Herndon argues that Travelers was arbitrary and capricious in its refusal to honor requests for change of agent of record from Gettys to Bush-Le-Normand by Herndon’s clients, and that Travelers’ actions constituted tortious interference with Herndon’s contractual relationship with its clients. Herndon also argues that the damages were inadequate, as it should receive commissions from all policies it placed at Gettys for as long as those policies remain at Gettys.
TRAVELERS
The trial court dismissed Herndon’s suit against Travelers, finding that it is the customer who chooses the insurance agency, not the broker.
|7The testimony from the Travelers witnesses established that Herndon was not an agency in good standing with Travelers, which is why its automobile book of business was cancelled in 1989. Herndon argues that prior to September 1, 1991, Travelers had no documented transfer policy of business written between Travelers’ Agents in good standing.
The Travelers’ witnesses, Barbara Sims and Paul Ratliff, testified that Travelers had a new business plan in place for the entire State of Louisiana in 1991 designed to reduce its loss ratios. Implementation of this plan reduced the number of agencies authorized to write Travelers’ automobile policies from around 120 to 40-50. Part of this business plan included requiring the insured to fill out a new policy application when transferring an existing policy from one Travelers agency to another, and that policy had to be signed by the new agency. Both Sims and Ratliff testified that this business plan was not specifically documented in any Travelers manuals, but it was communicated personally by them or their immediate assistants to all agencies in the State that were authorized to write Travelers policies in 1990. The same procedure had been required when Herndon transferred its business to Gettys in 1990.
Ratliff testified that once Gettys had the business, Herndon was no longer an owner of that business or an agent of Travelers. He said that Barbara Sims had handled the transfer from Gettys to Bush-LeNor-mand, and it was his recollection that no one requested a bordereau transfer in this instance.
Barbara Sims testified she was an account analyst at Travelers in 1991 and that she supervised the Bush-LeNormand agency. She testified that the attempted use of agent letters in 1991 to transfer policies from Gettys to Bush-LeNormand was improper, and the correct procedures, new applications, had been communicated to lsall Louisiana agents as per the business plan for the State. She sent the agent of record letters back to Bush-Le-Normand, telling them that they were improper procedure. She never contacted Gettys or Herndon about it, explaining that by that time Herndon was not an entity with Travelers. Sims said that no one requested a bordereau transfer, and in any event she would not have considered it. She had not seen that method used in over twenty years.
Both Sims and Ratliff testified that they had no personal animosity towards Hern-don, and had no profit to gain by “sand *784 bagging” Herndon’s ability to transfer the policies. Ratliff testified that the procedures required to transfer the business from Gettys to Bush were the same as had been required in the Herndon-Gettys transfer, and he couldn’t figure out why Herndon was having difficulty.
Gettys testified that it was he who requested that Herndon take its business elsewhere in 1991. He gave Herndon almost six months’ notice to do so, which he felt was generous, as the industry custom was 90 days. He testified that he did nothing to hinder this.
Mr. Jim Herndon testified that he handled the transfer of the business from Gettys to Bush-LeNormand. First, he said that Paul Ratliff said he could do it with agent of record letters or by new applications, but then rejected the agent of record letters as being deficient. When new letters were submitted, Herndon said that Ratliff then told him that letters were improper and new applications must be filled out. Herndon also said that he desired a bordereau transfer of the business from Gettys to Bush-LeNormand and notified Travelers, but they never replied. Herndon testified that Travelers frequently changed its mind on the transfer procedures Herndon could use and did everything to impede his moving his business. He further testified that it was embarrassing going to clients for another new application when they had just [ 3done so in 1990 for the transfer to Gettys. It was at this point that Herndon sued Travelers and Gettys.
Mike Herndon, an employee of Herndon during this time period, testified that he handled the transfers of business, though he was not involved in the negotiations between Herndon and Gettys, and Hern-don and Bush LeNormand. He said that Ratliff never told him that he needed new applications to transfer the business from Gettys to Bush-LeNormand. He also admitted that at no time was he an employee of Gettys or a servicing agent for Travelers. Both he and his father Jim acknowledged that it was always the client’s choice of what agent to use. He said that it was clear to him that Gettys would not be assisting Herndon in moving the policies from Gettys to Bush-LeNormand. Virgie Dee at Bush-LeNormand informed him that Travelers informed her that they would no longer accept applications from Herndon because Herndon no longer had those policies and was not an authorized Travelers agent.
Mike Herndon left Herndon agency in 1993 and his contacts with clients ended at that time. He was not aware that Gettys had asked Herndon to take its auto clients back in 1991. It was Mike’s position that Herndon was entitled to the commissions from the original Herndon policies forever, as long as that business stayed at Gettys or wherever they had transferred it. He was not aware of how many original Hern-don clients remained at Gettys, and he had no precise figures on what he thought Gettys owed Herndon.
Travelers, as the insurance company, had the authority to decide the terms of the transfers. Herndon argues that Travelers impeded the transfers from Get-tys to Bush-LeNormand by requiring new applications from the insured, a situation that was embarrassing and cumbersome to Herndon. The evidence does not support this position. The evidence, further, does not show that Travelers was arbitrary and 1 incapricious in refusing to honor the clients’ requests for transfers. Once the proper procedures were completed, these transfers were accomplished. Further, the evidence shows that Travelers did not interfere in any way with Herndon’s relationship with its clients. Barbara Sims testified that once the transfer was made *785 from Herndon to Gettys, the agent of record was Gettys, and that Herndon was a non-entity as far as Travelers was concerned. If Herndon was styling itself as a subagent of either Gettys or Bush-LeNor-mand, she was never told. Sims had no direct contact with Herndon or the clients, only with Bush-LeNormand in telling them that the agent letters were improper to accomplish the transfer from Gettys to Bush LeNormand. Once Travelers can-celled Herndon’s automobile authority, it did not tell Herndon to whom it could transfer the business or in any way prevent the transfers. Travelers did, however, have the authority to dictate the procedures it required for those transfers. The trial court did not err in dismissing Hern-don’s suit against Travelers.
DAMAGES
Herndon argues that from January 1, 1992 to 1999, it lost $8,623.07 in commissions because Travelers refused to allow the transfers from Gettys to Bush-LeNor-mand. Herndon argues that it would have been entitled to 50% of the commissions of the business it would have transferred to Bush-LeNormand. No evidence was introduced supporting these contentions or these figures. There was no evidence of the terms of the agreement between Hern-don and Bush-LeNormand. Likewise, the agreement between Gettys and Herndon was verbal. While Herndon testified that it felt it was entitled to 50% of the commissions from policies it placed with Gettys in perpetuity, this was based upon Jim and Mike Herndon’s assumptions h regarding the verbal agreement with Gettys. Get-tys’s testimony did not support their interpretation.
We find that Gettys was allowed to terminate its contract with Herndon in the end of 1991. However, we find that Get-tys’s unilateral reduction in the agreed-
upon commission rate to Herndon prior to the end of the contract in 1991 violated their agreement and is contrary to the law. Both Gettys and Herndon agreed that the commission rate would be a 50-50 split. While Gettys was legally entitled to terminate the arrangement, and did so, there is no support or justification for its lowering of Herndon’s commission from the stated rate before the end of the contract. Therefore, we amend the damage award to reflect that Herndon is entitled to 50% of the commissions through the end of 1991. The evidence indicates that Herndon was paid 30% of those commissions from October through December, and that this amount was $685.00, as testified to by Lawrence Gettys and as reflected in the judgment. If $685.00 was 30% of the commissions, 100% of the commissions was $2,283.33, and 50% of that equals $1,141.67. We therefore increase the damage award to Herndon to a total of $1,141.67 against defendant, Gettys. The judgment in all other aspects is affirmed.
AFFIRMED AS AMENDED.